1  Diana M. Torres (SBN 162284)
   diana.torres@kirkland.com
2  Yungmoon Chang (SBN 311673)
   yungmoon.chang@kirkland.com
3  KIRKLAND & ELLIS LLP
   333 South Hope Street
4  Los Angeles, CA 90071
   Telephone: (213) 680-8400
5  Facsimile: (213) 680-8500

6

7  Attorneys for Plaintiff
   AECOM ENERGY &
8  CONSTRUCTION, INC.

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11 AECOM ENERGY &                    ) CASE NO. 2:17-cv-05398
   CONSTRUCTION, INC., an Ohio       )
12 Corporation,                      ) PLAINTIFF'S MEMORANDUM
                                      ) OF POINTS AND
13            Plaintiff,             ) AUTHORITIES IN SUPPORT
                                      ) OF ITS MOTION FOR
14       v.                          ) PRELIMINARY INJUNCTION
                                      )
15 JOHN RIPLEY, an individual; TODD  ) Complaint Filed Date: July 21, 2017
   HALE, an individual; GARY         )
16 TOPOLEWSKI, an individual;        ) Judge:      Hon. Ronald S. W. Lew
   HENRY BLUM, an individual; BUD    ) Hearing Date: August 29, 2017
17 ZUKALOFF, an individual;          ) Time:       10:00 AM
   "MORRISON KNUDSEN                 ) Courtroom:   1
18 CORPORATION," a Nevada            )
   corporation; "MORRISON-           )
19 KNUDSEN COMPANY, INC.," a         )
   Nevada corporation; and           )
20 "MORRISON-KNUDSEN                 )
   INTERNATIONAL INC.," a Nevada     )
21 corporation,                      )
                                      )
22            Defendants.            )
   _____)

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

**INTRODUCTION** ...........................................................................................1

**BACKGROUND** ............................................................................................2

    **A.**    **Morrison Knudsen Was One of the Most Preeminent Engineering and Construction Companies of the Twentieth Century.**.............................................................................................2

    **B.**    **Defendants Made a Series of False Statements to Multiple Government Agencies to Usurp MK's Identity.**...............................4

        1.    Defendants Lied to the Nevada Secretary of State to Take Over and Rename Four Companies as Morrison Knudsen Entities. .................................................................................5

        2.    Defendants Defrauded the Patent and Trademark Office...........7

    **C.**    **Defendants Created the Fraudulent Website to Sell Goods and Services Posing as MK.**...........................................................9

    **D.**    **Defendants Continue to Infringe Despite Notice.**...........................12

**ARGUMENT**................................................................................................12

    **A.**    **The Preliminary Injunction Standard**.........................................12

    **B.**    **AECOM Is Likely to Succeed on the Merits of Its Claims.**..........13

        1.    AECOM Is Likely to Succeed on Its Passing Off and False Advertising Claims. .................................................................13

        2.    AECOM Is Likely to Succeed on Its Unfair Competition Claims. ...................................................................................17

        3.    AECOM Is Likely to Succeed on Its Cyberpiracy Claims.......18

    **C.**    **Defendants' Actions Have Caused, and Will Continue to Cause, Irreparable Harm to AECOM.**.............................................19

    **D.**    **The Balance of Hardships Favors Granting a Preliminary Injunction.**..................................................................................22

    **E.**    **An Injunction Is in the Public Interest.**.......................................24

**CONCLUSION** ............................................................................................25

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*2Die4Kourt v. Hillair Capital Mgmt., LLC*,
    No. 16-56217, 2017 WL 2304376 (9th Cir. May 26, 2017) .....................20

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ............................................................13, 19

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co. Ltd.*,
    534 Fed. App'x 633 (9th Cir. 2013) ..........................................................24

*AT&T Corp. v. Vision One Sec. Sys.*,
    No. 95-0565, 1995 WL 476251 (S.D. Cal. July 27, 1995)........................24

*Beckman Coulter, Inc. v. Beckcoult.com*,
    No. C 10-03110, 2010 WL 2985560 (N.D. Cal. July 26, 2010) ...............23

*Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.*,
    174 F.3d 1036 (9th Cir. 1999) ............................................................19, 24

*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*,
    156 F. Supp. 3d 1173 (E.D. Cal. 2016) ....................................................20

*Cadence Design Sys. Inc. v. Avant! Corp.*,
    125 F.3d 824 (9th Cir. 1997) .....................................................................23

*Cairns v. Franklin Mint Co.*,
    24 F. Supp. 2d 1013 (C.D. Cal. 1998) ......................................................16

*China Century Television v. Create New Tech. (HK) Ltd.*,
    No. cv 15-01869, 2015 WL 3649187 (C.D. Cal. June 11, 2015)..............19

*Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*,
    911 F.2d 242 (9th Cir. 1990) .....................................................................14

*CytoSport, Inc. v. Vital Pharm., Inc.*,
    617 F. Supp. 2d 1051 (E.D. Cal. 2009)
    *aff'd*, 348 Fed. App'x 288 (9th Cir. 2009)................................................20

*Daniels v. Community Lending, Inc.*,
    621 Fed. App'x 427 (9th Cir. 2015) ..........................................................13

*Diller v. Barry Driller, Inc.*,
    No. CV 12-7200, 2012 WL 4044732 (C.D. Cal. Sept. 10, 2012) .............23

*Groupe SEB USA v. Euro-Pro Operating LLC*,
    774 F.3d 192 (3d Cir. 2014) ......................................................................20

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
    2014 WL 2002126 (W.D. Penn. May 15, 2014),
    *aff'd* 774 F.3d 192 (3d Cir. 2014).............................................................24

i

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Hall v. Time Inc.*,
158 Cal. App. 4th 847 (Cal. Ct. App. 2008)............................................................17

*Herb Reed Enters., v. Fla. Entm't Mgmt., Inc.*,
736 F.3d 1247 (9th Cir. 2013) ................................................................................20

*In re Pomona Valley Med. Grp., Inc.*,
476 F.3d 665 (9th Cir. 2007) ..................................................................................17

*In re Sony Gaming Networks and Customer Data Sec. Breach Lit.*,
903 F. Supp. 2d 942 (S.D. Cal. 2012) .....................................................................17

*JHP Pharm., LLC v. Hospira, Inc.*,
52 F. Supp. 3d 992 (C.D. Cal. 2014) .......................................................................15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
134 S. Ct. 1377 (2014) ...........................................................................................17

*Maier Brewing Co. v. Fleischmann Distilling Corp.*,
390 F.2d 117 (9th Cir. 1968) ..................................................................................24

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma*,
571 F.3d 873 (9th Cir. 2009) ..................................................................................13

*Neighborhood Assistance Corp. of Am. v. First One Lending Corp.*,
No. 12-463, 2012 WL 1698368 (C.D. Cal. May 15, 2012) ......................................17

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
920 F.2d 187 (3d Cir. 1990) ...................................................................................20

*Phillip Morris USA Inc. v. Shalabi*,
352 F. Supp. 2d 1067 (C.D. Cal. 2004) ...................................................................13

*POM Wonderful LLC v. Purely Juice, Inc.*,
No. CV-07-02633, 2008 WL 4222045 (C.D. Cal. July 17, 2008)
*aff'd*, 362 Fed. App'x 577 (9th Cir. 2009)...............................................................23

*Qualitex Co. v. Jacobson Prod. Co.*,
514 U.S. 159 (1995)................................................................................................24

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991) ..................................................................................20

*Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*,
93 F.3d 511 (8th Cir. 1996) ....................................................................................15

*Ruiz v. Gap, Inc.*,
540 F. Supp. 2d 1121 (N.D. Cal. 2008) ...................................................................17

*Smith v. Montoro*,
648 F.2d 602 (9th Cir. 1981) ..................................................................................14

*Southland Sod Farms v. Stover Seed Co.*,
108 F.3d 1134 (9th Cir. 1997) ................................................................................15

## <u>TABLE OF AUTHORITIES (CONT'D)</u>

<u>Page(s)</u>

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*,
  240 F.3d 832 (9th Cir. 2001) ................................................................ 17, 20

*Sun Microsystems, Inc. v. Microsoft Corp.*,
  87 F. Supp. 2d 992 (N.D. Cal. 2000) ............................................................ 23

*TrafficSchool.com, Inc. v. Edriver Inc.*,
  653 F.3d 820 (9th Cir. 2011) ...................................................................... 14

*U-Haul Int'l, Inc. v. Jartan, Inc.*,
  793 F.2d 1034 (9th Cir. 1986) .................................................................... 15

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
  681 F.2d 1159 (9th Cir. 1982) .................................................................... 25

*Warner Bros. Entm't vs. Glob. Asylum, Inc.*,
  No. CV 12-9547, 2012 WL 6951315 (C.D. Cal. Dec. 10, 2012)
  *aff'd sub nom. Warner Bros. Entm't v. Glob. Asylum, Inc.*,
  544 Fed. App'x 683 (9th Cir. 2013) ............................................................ 24

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................ 13, 19

*Zobmondo Ent., LLC v. Falls Media, LLC*,
  602 F.3d 1108 (9th Cir. 2010) .................................................................... 19

**Statutes**

15 U.S.C. § 1125(a)(1) ........................................................................ 14

15 U.S.C. § 1125(d) .......................................................................... 18

**Rules**

Cal. Bus. Prof. Code §§ 17200 *et seq.* .................................................. 17

**<u>INTRODUCTION</u>**

This is a case of corporate identity theft.  Defendants have committed, and continue to commit, a remarkable and elaborate fraud involving repeated false statements to government entities, forged documents, and numerous portrayals of themselves as Morrison Knudsen Corporation ("MK"), an iconic civil engineering and construction company that holds a prominent place in American and world history. MK, after a series of acquisitions and name changes, is now Plaintiff AECOM Energy & Construction, Inc. ("AECOM"), which owns MK's intellectual property and goodwill.  Defendants, in contrast, are not MK, and have no right to claim to be MK.

Nonetheless, Defendants have gone to great lengths to impersonate MK.  They resurrected two dissolved subsidiaries of MK in Nevada, reinstated a third, unrelated entity, and repurposed yet a fourth entity that they already controlled—and changed their names so that they all bore the Morrison Knudsen name and appeared to be Morrison Knudsen affiliates.  They also changed the address of record for trademark registrations owned by MK to their own address.  They even forged an assignment for one of those trademarks, and submitted that forgery to the United States Patent and Trademark Office.  And they created a website at www.Morrison-Knudsen.com (the "Fraudulent Website") on which they claim to be MK and tout many of MK's accomplishments as their own.  Through that website, they offer expensive used construction equipment that bears (whether in actuality or through Photoshop) the MK logo and offer consulting and finance services that they claim to back with MK's expertise and for which they seek an equity stake in other companies' projects.

Defendants' charade must end.  Every day Defendants' fraudulent claims remain in the marketplace, Defendants deceive actual and potential customers and business partners, and irreparably harm AECOM's reputation and goodwill by using stolen corporate entities to offer construction equipment and services purportedly backed by MK's expertise.  AECOM tried to resolve this matter without court intervention, but Defendants' remarkable response to AECOM's cease and desist

letter (followed by complete silence) and the great lengths to which Defendants have gone to steal MK's identity made clear that Defendants will not voluntarily comply. AECOM has brought suit for false advertising, passing off and cyberpiracy under the Lanham Act, 15. U.S.C. §§ 1125(a)(1)(A) & (B) and § 1125(d) and California statutory and common law unfair competition.  As set forth herein, AECOM also asks this Court to enjoin Defendants preliminarily from any further representations—to the government, to actual and potential customers, and to the public—that they are MK, that MK's accomplishments are their own, that the products and services they offer originate from MK, or are affiliated with, backed, sponsored or endorsed by, or have any relationship whatsoever to MK, and from any further use of Morrison Knudsen or any confusingly similar name, including the morrison-knudsen.com domain name.

## BACKGROUND

### A.   Morrison Knudsen Was One of the Most Preeminent Engineering and Construction Companies of the Twentieth Century.

Morrison Knudsen Corporation holds a special place in American history. Founded in the early 1900's by Harry Morrison and Morris Knudsen, MK became a multinational engineering and construction powerhouse whose many notable projects include the Hoover Dam, the San Francisco-Oakland Bay Bridge, and the Trans-Alaska Pipeline.  Declaration of Charles Szurgot ("Szurgot Decl.") ¶ 6.  MK made such an impact that in 1954 TIME magazine wrote a story on MK, featuring Harry Morrison on its cover and proclaiming him as "the man who has done more than anyone else to change the face of the earth."  Szurgot Decl. ¶ 6, Ex. A.



1    In 1996, MK merged with another construction and engineering firm,

2  Washington Construction Group, Inc.  Szurgot Decl. ¶ 7; Declaration of Richard D.

3  Parry ("Parry Decl.") ¶ 3.  The surviving entity operated as Morrison Knudsen

4  Corporation until 2000, when MK changed its name to Washington Group

5  International.  Szurgot Decl. ¶ 7; Parry Decl. ¶ 3.  In 2007, MK, then known as

6  Washington Group International, was acquired by URS Corp. ("URS") and renamed

7  accordingly.  Szurgot Decl. ¶ 8; Parry Decl. ¶ 3.  In 2014, AECOM Corp. acquired

8  URS and its subsidiaries.  Szurgot Decl. ¶ 9.  Despite its changes in name and

9  ownership, MK continued to offer the same types of engineering and construction

10  services that made it one of the most influential companies ever to exist in its industry.

11  Szurgot Decl. ¶ 8; Parry Decl. ¶ 3.

12    MK left its mark on American society beyond construction as well.  For more

13  than fifty years, MK published a magazine for its employees called the *The Em-*

14  *Kayan*, available online at http://mk-foundation.org/read-all-the-em-kayan-

15  magazines/.  Its employees started a charitable foundation in Boise, Idaho, where MK

16  was headquartered, that still exists today (www.mk-foundation.org).  And its people

17  made history in World War II when they built an airstrip, and then fought and died

18  alongside, the United States Marine Corps after Pearl Harbor.  Parry Decl. ¶ 4.  The

19  Boise State University library lists a collection of books and articles written about the

20  company.  https://archives.boisestate.edu/?q=morrison+knudsen&site=boisestate.edu.

21    MK used many trademarks, including the word mark MORRISON KNUDSEN,

22  the MK logo and the combined word and design mark MKCO MORRISON

23  KNUDSEN (each an "MK Mark"; collectively, the "MK Marks").  Declaration of

24  Annette Bottaro-Walklet ("Walklet Decl.") ¶ 1.

25

26

27

28

   

3

Those trademarks were owned and registered with the United States Patent and

Trademark Office ("USPTO") by Morrison Knudsen Corporation—an Ohio company

that is now AECOM Energy & Construction, Inc., the Plaintiff in this action. *Id.*;

Szurgot Decl. ¶¶ 7–9.

Through their consistent use for roughly 100 years, the MK Marks achieved

tremendous recognition and goodwill, and became associated with MK's premier

design, engineering and construction services. The MK Marks have appeared, among

other places, on construction equipment, locomotive parts, and design materials, on

bid and promotional materials for engineering, construction and related services, and

denote the expertise of the company that built American airfields in World War II,

NASA's Kennedy Space Center, and the Hoover Dam. Walklet Decl. ¶ 4; Szurgot

Decl. ¶ 6. Even today, years after the company changed its corporate name, the MK

Marks appear in AECOM promotional materials detailing a century of design,

engineering and construction expertise. Szurgot Decl. ¶ 10; Parry ¶ 4; Declaration of

Tara McAdam Kassal ("Kassal Decl.") ¶ 4.

## B. <u>Defendants Made a Series of False Statements to Multiple Government Agencies to Usurp MK's Identity.</u>

In 2008, unbeknownst to MK, Defendants began what would become an

intricate series of frauds designed to trade off, and indeed take over, the MK identity.

As discussed below, Defendants did so, in part, by impermissibly resurrecting two

former MK subsidiaries that had been dissolved, taking over another unrelated entity

that had been abandoned and which they renamed with a "Morrison Knudsen" name,

and by changing the name of another unrelated company that they controlled so that it

too had a name that included "Morrison Knudsen." Declaration of Diana M. Torres

("Torres Decl.") ¶¶ 3–6, Exs. 1–4. Defendants also submitted false documents to the

USPTO, including fraudulent address changes and a forged assignment, to gain

control of two of the MK Marks. Walklet Decl. ¶¶ 6–9, Exs. F–G; Torres Decl. ¶ 7,

Ex. 5. And Defendants sent out phony press releases and set up the Fraudulent

4

Website using the domain name www.Morrison-Knudsen.com, on which they claim to be MK and take credit for MK's accomplishments.  Torres Decl. ¶ 8, Ex. 6.

### 1. Defendants Lied to the Nevada Secretary of State to Take Over and Rename Four Companies as Morrison Knudsen Entities.

Defendants apparently embarked on their fraud by taking over Morrison-Knudsen Services, Inc., a former affiliate of MK.  That entity was incorporated in 1982 and dissolved in 2002, by its General Counsel and Corporate Secretary.  Parry Decl. ¶ 5; Torres Decl. ¶ 3, Ex. 1 at 12–17, 19–20, 49.  On July 28, 2008, Defendant Hale, however, revived Morrison-Knudsen Services, Inc.  To do so, he filed a Certificate of Revival of a Nevada Corporation, seeking reinstatement of that entity, falsely swearing under penalty of perjury that he had authority from the Board of Directors of Morrison-Knudsen Services, Inc. to do so.  Torres Decl. ¶ 3, Ex. 1 at 52–55.  Based on that false statement, and without any lawful permission from anyone affiliated with MK, the Nevada Secretary of State revived Morrison-Knudsen Services, Inc.  Parry Decl. ¶ 5; Szurgot Decl. ¶ 14; Torres Decl. ¶ 3, Ex. 1 at 52–55.  Since then, Defendants have filed multiple lists of directors and officers, listing themselves and others who have no legitimate affiliation with MK and listing their address as 2049 Century Park East, Suite 3850, Los Angeles, California 90067.  Torres Decl. ¶ 3, Ex. 1 at 61–71.  Defendants' address is diagonally across the street from AECOM's headquarters.  Szurgot Decl. ¶ 18.

Defendants similarly took over another dissolved Nevada affiliate of MK, Morrison Knudsen Corporation of Viet Nam.  That entity was incorporated in 1996, but dissolved in 2002.  Parry Decl. ¶ 6.  On October 22, 2014, however, Defendants Topolewski and Blum submitted a form to the Nevada Secretary of State asking to reinstate Morrison Knudsen Corporation of Viet Nam, and swearing under penalty of perjury that they had the authority of the Board of Directors of that company to do so.  Torres Decl. ¶ 4, Ex. 2 at 95.  Topolewski's and Blum's sworn statements were false: they had no authority to take any action whatsoever on behalf of the dissolved

5

Morrison Knudsen Corporation of Viet Nam.  Szurgot Decl. ¶ 14; Parry Decl. ¶ 6.
Nonetheless, with their false sworn statement to the government of Nevada, Morrison
Knudsen Corporation of Viet Nam was revived.  *See* Torres Decl. ¶ 4, Ex. 2 at 97–99.
On October 30, 2014, Topolewski, again falsely swearing that he had the authority to
do so, changed the name of Morrison Knudsen Corporation of Viet Nam to "Morrison
Knudsen Corporation."  Torres Decl. ¶ 4, Ex. 2 at 100.  The annual list of officers,
filed on January 27, 2016, reflects the name change.  Torres Decl. ¶ 4, Ex. 2 at 101.
Since then, the lists of directors and officers for Morrison Knudsen Corporation, the
most recent of which was filed by Blum as its Vice President, lists 2049 Century Park
East, Suite 3850, Los Angeles, California 90067 as its address.  Szurgot Decl. ¶ 18;
Torres Decl. ¶ 4, Ex. 2 at 101–04.

Defendants also changed the name of an existing unrelated company that
Defendants had operated for years to make it appear to be an affiliate of MK.  On May
23, 2016, Defendant Zukaloff filed a Certificate of Amendment with the Nevada
Secretary of State changing the name of E Planet Communications Inc. to Morrison
Knudsen International Inc.  Torres Decl. ¶ 5, Ex. 3 at 125.  Zukaloff was, at that time,
E Planet Communications' Compliance Officer.  Torres Decl. ¶ 5, Ex. 3 at 119.
Topolewski had been its President and Secretary in 2012.  Torres Decl. ¶ 5, Ex. 3 at
113.  The most recent list of officers and directors of this entity was filed with the
Nevada Secretary of State in January 2017 by Blum as its Vice President under
penalty of perjury, and listed 2049 Century Park East, Suite 3850, Los Angeles,
California 90067 as their address.  Torres Decl. ¶ 5, Ex. 3 at 126–27.

Finally, Defendants also fraudulently took control of a wholly unrelated defunct
entity and renamed it to indicate that it too was an affiliate of MK.  Westland
Development Company, later Westland Petroleum Corporation ("WPC"), was an
entity incorporated in Nevada in 1926 that had fallen out of good standing in or
around 2013.  Torres Decl. ¶ 6, Ex. 4 at 130–136, 149–150.  On October 6, 2016,
however, Defendants, through "John Anderson," listed as the Vice President of WPC,

6

requested and received reinstatement of WPC with the Nevada Secretary of State, claiming under penalty of perjury that he was authorized to do so.  Torres Decl. ¶ 6, Ex. 4 at 150.  That same day, "Anderson" filed, under penalty of perjury, a list officers and directors, citing 2049 Century Park East, Suite 3850, Los Angeles, California 90067 as the address for several of the officers and directors, and submitted a change of registered agent form, listing himself as the agent for service of process.  Torres Decl. ¶ 6, Ex. 4 at 151–52.  On or about October 18, 2016, Defendants requested that WPC's name be changed to "Morrison-Knudsen Company, Inc.," a change that was thereafter reflected on the books and records of the Nevada Secretary of State.  Torres Decl. ¶ 6, Ex. 4 at 153.  The Certificate of Amendment changing the company's name was signed by Defendant Ripley.  Torres Decl. ¶ 6, Ex. 4 at 153.

## 2.    Defendants Defrauded the Patent and Trademark Office.

As part of their takeover of the MK identity, Defendants also made knowing false statements to a federal government agency, the United States Patent and Trademark Office ("USPTO").  At all relevant times until November 10, 2014, the USPTO records reflected that MK's registered trademarks, MORRISON KNUDSEN, Reg. No. 1716505 and MKCO MORRISON KNUDSEN, Reg. No. 1744815, were owned by Morrison Knudsen Corporation, an Ohio company, whose name was later changed to Washington Group International, an Ohio company (now the Plaintiff in this litigation).  Walklet Decl. ¶¶ 4–5.  Until then, the USPTO records also properly reflected MK's Boise, Idaho address.  *Id.* ¶¶ 4–5.  On November 10, 2014, however, Hale submitted "change of address" requests to the USPTO, seeking to change the addresses for Reg. No. 1744815 and Reg. No. 1716505 to the address used by Defendants: 2049 Century Park East, Suite 3850, Los Angeles, California 90067 and an email address of Todd.Hale@Morrison-Knudsen.com.  *Id.* ¶ 6.  In doing so, Hale represented to the USPTO that he had the right and authority to request the changes.  *Id.* ¶¶ 6–8.  Hale's statement was false, and he knew it:  MK did not authorize Hale to

7

change the registrations' records at all, let alone to change the addresses to physical and electronic addresses controlled by Defendants.  *Id.* ¶ 9.  With Hale's false representation, however, the USPTO's records reflected Defendants' address and Hale's email address as the contact information for the owner of those marks.  Walklet Decl. ¶ 6, Ex. F.

One year later, on November 11, 2015, Zukaloff forged an assignment of Reg. No 1744815 to Morrison Knudsen Corporation, 2049 Century Park East, Suite 3850, Los Angeles, California 90067, and an email address associated with the domain of the Fraudulent Website, pat@morrison-knudsen.com.  Walklet Decl. ¶ 7, Ex. G.  With these changes, Defendants succeeded in making it appear, in federal government records, that they were, in fact, MK and had the right to claim MK's accomplishments as their own.  In making these changes, however, Defendants were warned that "providing false or spurious information such as false or improper assignment documents . . . is a misrepresentation to the federal government . . . subject to criminal and civil penalties."  Torres Decl. ¶ 13, Ex. 10.

AECOM did not renew the registrations for those marks, however, and thus Reg. No. 1716505 (MORRISON KNUDSEN) and Reg. No. 1744815 (MKCO MORRISON KNUDSEN ) were cancelled in February 2016.  Apparently realizing that the registrations that they had stolen had been allowed to lapse, Defendants made yet more false statements to the USPTO.  On March 26, 2016, Defendants applied to register the mark MORRISON KNUDSEN, falsely representing to the USPTO that they had the right and authority to do so and that the mark's first use in commerce was "at least as early as April 18, 1933," i.e., a date when MK, not Defendants, used the MORRISON KNUDSEN mark.  Torres Decl. ¶ 7, Ex. 5 at 155.  In reliance on Defendants' false affirmation that they were the rightful owner of the mark and had the right to claim a first use date of April 18, 1933, the USPTO issued Registration No. 5077287 for MORRISON KNUDSEN on November 8, 2016, for the following services: Construction and repair services in connection with public and private sector

8

1  projects, namely, construction of dam sites and utility facilities, construction of
2  bridge, road, rail, marine and air transportation facilities, and construction of industrial
3  facilities; General construction contracting.  Walklet Decl. ¶ 8, Ex. H.  The registrant
4  was listed as "Morrison Knudsen Corporation" with an address at 2049 Century Park
5  East, Suite 3850, Los Angeles, California 90067 (Torres Decl. ¶ 7, Ex. 5 at 155)—
6  giving further credence to Defendants' fraudulent claim that they are MK.

7  **C.   Defendants Created the Fraudulent Website to Sell Goods and Services Posing as MK.**
8

9       Having fraudulently changed the registration records of the MK Marks and
10  obtained their own trademark registration based on MK's use of the MK Marks, and
11  having gained control of four companies that now bear the Morrison Knudsen name
12  through their fraud on the Nevada Secretary of State, Defendants perpetuate their
13  sham through the Fraudulent Website.  For example, on the Fraudulent Website's
14  home page they display several of MK's projects, saying "From this...  To This...  To
15  This."  Szurgot Decl. ¶ 11, Ex. C at 40 (depicting snapshot of the home page).  Then,
16  in a section titled "About MK," Defendants include a detailed description of MK's
17  corporate history, embed video documentaries about MK that MK produced, and
18  describe all of MK's accomplishments using the first person (i.e., "we" and "our").
19  *Id.* ¶ 11, Ex. C at 41–43 (e.g., "We are the world's largest dam builder and constructor
20  of hydro power projects with 160 dams built in the Company's history along with 100
21  hydro power plants.").

22       Similarly, in sections titled "Dams," "Space," "Mining," "Naval," "Power,"
23  "Industrial," "Oil & Gas," "Infrastructure," and "Current Projects," Defendants also
24  falsely claim that they are responsible for scores of MK projects and show
25  photographs of many of those projects, complete with construction equipment used in
26  connection with such projects.  Szurgot Decl. ¶ 11, Ex. C at 50–52.  Among the
27  projects Defendants list as their own are both MK projects performed prior to its
28  acquisition by AECOM and current AECOM projects.  *See* Szurgot Decl. ¶ 11, Ex. C

at 47–49; Declaration of Patricia Olson ("Olson Decl.") ¶ 3.  Defendants even claim to have a business relationship with construction equipment maker Caterpillar—a relationship that *AECOM* has.  Szurgot Decl. ¶ 11, Ex. C at 53; Olson Decl. ¶ 4.



The Company continues its work as a first in class mining partner throughout North and South America. Overburden removal and contract mining continue in the country's largest coal mines in Wyoming, Montana, Texas, Arizona, Ohio, Alaska and Colorado. Annual excavation volumes are in excess of 300 million cubic yards as we enter our seventh decade as a leading global contractor in the mining industry.





Our company has been providing complete facility management services (FM) in support of the Caterpillar headquarters in Peoria, IL. Today, under a "Master Global Facilities Services Agreement," Morrison-Knudsen and our suppliers employ over 2,900 people performing FM services at 15 Caterpillar sites worldwide. We add value and drive savings through the delivery of a consistent service model, consolidation of subcontractors, and leveraging a shared services concept.

Defendants have engaged in this elaborate fraud for financial gain. First, Defendants appear to be bidding and, according to their own press releases, winning contracts. For example, in a press release dated April 11, 2017, Defendants claim to have been awarded a $1.2 billion dollar project. Torres Decl. ¶ 8, Ex. 6. Whether the claims in the press release are true or not, Defendants are conveying to the public that MK is responsible for projects in which MK is not actually involved.

Second, Defendants are using the Fraudulent Website to sell expensive construction equipment. On a page titled "Equipment For Sale," Defendants offer for sale construction equipment ranging from used tractors to refurbished dump valves. Szurgot Decl. ¶ 11, Ex. C at 44. Much of the used equipment bears the Morrison Knudsen name and logo, effectively reinforcing the message that the equipment is being offered for sale by MK after having been used, maintained, and inspected by MK, none of which is true, but all of which would be important to a customer looking to buy used construction equipment.

Third, Defendants seek to profit by soliciting equity positions in third party contracts. By falsely claiming that they are MK and falsely claiming credit for MK's projects, they portray themselves as having MK's vast experience and resources, which they can use to assist others in return for equity stakes in projects. Specifically, in the Finance section of the Fraudulent Website, Defendants offer to "tak[e] equity positions in a variety of projects," falsely claiming that they can "back your project with [MK's] engineering capabilities, construction resources, . . . equipment lend/lease and financing." Szurgot Decl. ¶ 11, Ex. C at 45. Defendants list Ripley, along with his email address and Defendants' phone number, as the person to contact concerning finance opportunities. *Id.* Of course, Defendants cannot actually back anyone's project with MK's engineering capabilities or construction resources, because Defendants are not MK.

Defendants have no authorization to use the Morrison Knudsen name or the

MK Marks, or to claim any association, affiliation or sponsorship whatsoever. Walklet Decl. ¶ 9; Szurgot Decl. ¶¶ 14–16; Parry Decl. ¶¶ 5–8; Kassal Decl. ¶ 7. Through their unauthorized conduct, however, Defendants have succeeded in deceiving third parties into believing that they are the real MK.  Indeed, online searches for "Morrison Knudsen" return the Fraudulent Website at or near the top of the results.  Szurgot Decl. ¶ 17, Ex. D.  And the Wikipedia page for MK, which also appears at the top of online search results, falsely lists the Fraudulent Website as MK's official website and falsely states that MK changed its name in 2007 to "Morrison Knudsen International," i.e., the company that Defendants controlled for years as E Planet Communications, Inc., but renamed Morrison Knudsen International just last year.  Szurgot Decl. ¶ 17, Exs. D & E; Torres Decl. ¶ 5, Ex. 3 at 125.

### D.    Defendants Continue to Infringe Despite Notice.

On May 23, 2017, AECOM, through Michael Gallo, emailed sales@morrison-knudsen.com inquiring whether the Northern toolboxes on the Fraudulent Website were available.  Declaration of Michael Gallo (Gallo Decl.) ¶ 3, Ex. K.  Defendants responded within the hour that they were.  *Id.*  On May 30, 2017, AECOM wrote to Defendants, demanding that they cease their unauthorized usage of the Morrison Knudsen name and MK Marks, and never again claim an affiliation with MK or its projects.  Torres Decl. ¶ 10, Ex. 8.  Ripley replied, labeling AECOM's claims "idiotic" and "moronic," accusing AECOM of fraudulently misrepresenting its relationship to MK, and threatening to pursue legal action.  *Id.* ¶ 11, Ex. 9.  AECOM responded by detailing its acquisition of MK and providing links to the SEC filings documenting the transactions.  *Id.*  AECOM's response also requested that Defendants disclose the basis, if any existed, for Defendants' assertion that they were MK.  *Id.* Defendants did not respond, and continue their fraudulent and deceptive activities.

### ARGUMENT

### A.    The Preliminary Injunction Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to

1   succeed on the merits, that he is likely to suffer irreparable harm in the absence of

2   preliminary relief, that the balance of equities tips in his favor, and that an injunction

3   is in the public interest." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma*, 571 F.3d

4   873, 877 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S.

5   7, 20 (2008)).  "[T]he elements of the preliminary injunction test are balanced, so that

6   a stronger showing of one element may offset a weaker showing of another." *Alliance*

7   *for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Notably, while

8   a plaintiff can obtain a preliminary injunction by showing a likelihood of success on

9   just one of its claims, AECOM can show a likelihood of success on *all* of its claims.

10  *See Daniels v. Community Lending, Inc.*, 621 Fed. App'x 427, 427 (9th Cir. 2015).

11          The balancing of factors weighs strongly in favor of a preliminary injunction.

12  AECOM is likely to succeed on the merits of its claims:  Defendants have fraudulently

13  represented under oath to multiple government agencies that they are MK, are falsely

14  portraying themselves as MK and advertising their products and services (including

15  used and potentially dangerous construction equipment) as coming from MK, to the

16  public.  And Defendants registered the domain name using MK's primary mark at a

17  time when that mark was demonstrably distinctive.  The damage to the MK reputation

18  and goodwill, which rightly belongs to AECOM, is unquantifiable and is precisely the

19  type of irreparable injury that injunctive relief is designed to prevent.  Moreover, both

20  the public interest and the balance of hardships weigh in favor of the injunction, as the

21  law recognizes no hardship in requiring a defendant to stop committing crimes and to

22  cease sham activities.  *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1075

23  (C.D. Cal. 2004) (granting a permanent injunction where relative hardships weighed

24  in plaintiff's favor, as "Plaintiff is only seeking to enjoin illegal activity").

**B.**   **AECOM Is Likely to Succeed on the Merits of Its Claims.**

**1.**   **AECOM Is Likely to Succeed on Its Passing Off and False Advertising Claims.**

28  AECOM can easily show that Defendants are falsely passing themselves off as

MK and, accordingly, passing off the products and services they offer as coming from MK, in violation of the Lanham Act.  The Lanham Act forbids any false designation of origin "which . . . is likely to cause confusion, or to cause mistake . . . as to the origin, sponsorship, or approval of his or her goods [or] services . . . ."  15 U.S.C. § 1125(a)(1) .  "'[P]assing off' is the selling of a good or service of one's own creation under the name or mark of another."  *Smith v. Montoro*, 648 F.2d 602, 604 (9th Cir. 1981).  In countless statements to consumers on the Fraudulent Website and in their false representations to the Nevada Secretary of State and the USPTO, Defendants have expressly claimed that they are MK, that they have designed and built all of the tremendous projects that MK has designed and built, and that they therefore have the expertise to offer the products and services shown on the Fraudulent Website.  In reality, Defendants are not MK, the equipment and services they offer for sale do not come from MK, and, whatever expertise Defendants may have, it is not that of MK.  *See* Background, Section C, *supra*.

AECOM can also readily show that Defendants are liable for false advertising.  Both the Lanham Act and California law prohibit "false or misleading description[s] of fact, or false or misleading representation[s] of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . ."  15 U.S.C. § 1125(a)(1)[1]; *see JHP Pharm., LLC v. Hospira, Inc.*, 52 F.

---

[1] To prove false advertising, a plaintiff must show that (1) the defendant made a false or misleading statement of fact in a commercial advertisement about its own or another's product, (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience, (3) the statement is material, in that it is likely to influence purchasing decisions, (4) the false statements are made in interstate commerce, and (5) the plaintiff has been or is likely to be injured as a result of the false statement.  *See, e.g.*, *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir. 1990).  There is no question that Defendants are making these statements in interstate commerce: They are making them on their own website and in press releases available online.  *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 829 n.3 (9th Cir. 2011) ("A plaintiff bringing a false advertising claim must also show that defendant caused its false or misleading statement to enter interstate commerce, . . . but this is virtually automatic for websites.").

Supp. 3d 992, 997 n.4 (C.D. Cal. 2014) (noting that state claims for misleading advertising, including Cal. Bus. & Prof. Code § 17500, are "substantially congruent" to Lanham Act claims).  A plaintiff may establish the "falsity" of the advertisement in one of two ways; by "show[ing] that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers."  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  Where a statement is literally false or where the defendant intentionally set out to deceive, materiality is presumed.  *See U-Haul Int'l, Inc. v. Jartan, Inc.*, 793 F.2d 1034 (9th Cir. 1986) (where defendant violates Lanham Act willfully or in bad faith, plaintiff not required to provide other evidence to prove materiality or the impact of the statement on consumers).

AECOM can easily show that Defendants are engaging in false advertising.  First, Defendants falsely state in press releases that MK is being awarded contracts, which MK is not.  Second, Defendants offer for sale used construction equipment (much of which bears the MK Marks) and seek equity stakes in other companies' projects on a website in which they claim to be MK, describe MK's accomplishments as their own, and depict MK's projects, along with multiple pictures of the same or similar construction equipment.  Their claim to be MK, to have MK's experience and expertise and to be able to use that expertise and experience to "back" other companies' projects in return for equity stakes in those projects is literally false.  Moreover, these statements, when viewed in context, necessarily imply, falsely, that the equipment, advice and finance services Defendants offer are being offered by one of the oldest and most successful companies in American engineering and construction history—MK.  *See Southland Sod Farms*, 108 F.3d at 1139 ("When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context."); *Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 516 (8th Cir. 1996) (drug manufacturer's television advertisement showing images of two gasoline pumps side by side, but displaying

15

different prices, together with a question "Which one would you choose" held to be literally false because advertisement inaccurately portrayed manufacturer's and competitor's drugs as substitutes for one another).

Because Defendants' claims are all literally false, AECOM need not show that such statements are material or likely to deceive.  Nonetheless, these statements are inherently deceptive and material.  The products and services Defendants sell (expensive, used construction equipment, financing for construction projects and, according to Defendants' press release, actual construction services) are the types of products and services that consumers seek from a well-established source.  *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1042 (C.D. Cal. 1998) (finding a higher degree of consumer care because, in part, the "products are not inexpensive goods purchased in the grocery or drug store").  Indeed, the construction equipment Defendants offer for sale on the Fraudulent Website runs from $22,000 to $200,000 per piece.  The finance services, whereby Defendants seek "equity positions in a variety of projects," including "mining, all power sources . . . , toll roads, airport concessions, oil and gas projects, pipelines, commercial development," are certain to involve millions of dollars.  Szurgot Decl., Ex. C at 45.  And actual engineering and construction projects may involve billions of dollars, as Defendants' recent press release asserts.  Torres Decl. ¶ 8, Ex. 6.  Purchasers of expensive construction equipment, contractors looking for assistance, and developers looking to award construction contracts are certain to look for companies with a long-standing reputation in the engineering and construction industry.  In other words, the high stakes involved in Defendants' offerings are precisely what makes their scam so material to a prospective client or business partner.

Finally, AECOM can show injury.  AECOM has already lost control of two of its affiliates that were dissolved but resurrected by Defendants, lost control of its trademark registrations and effectively lost the ability to claim sole credit for its own accomplishments.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct.

1377, 1393 (2014) (stating that as to false advertising, injuries such as "damage to . . . business reputation . . . are injuries to precisely the sorts of commercial interests the [Lanham] Act protects"); *Neighborhood Assistance Corp. of Am. v. First One Lending Corp.*, No. 12-463, 2012 WL 1698368, at *18 (C.D. Cal. May 15, 2012) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001)) ("Loss of . . . the ability to control one's own reputation is a cognizable harm under the Lanham Act.").

In short, given the nature of Defendants' fraudulent scam, the literal falsity of Defendants' multiple assertions, and the harm that Defendants have inflicted, AECOM is likely to succeed on the merits of its passing off and false advertising claims.

## 2. AECOM Is Likely to Succeed on Its Unfair Competition Claims.

AECOM is also likely to prevail on its statutory unfair competition claim under California law ("UCL"). "California's unfair competition statute prohibits any unfair competition, which means 'any unlawful, unfair or fraudulent business act or practice.'" *In re Pomona Valley Med. Grp., Inc.*, 476 F.3d 665, 674 (9th Cir. 2007) (citing Cal. Bus. Prof. Code §§ 17200 *et seq.*). To have standing, "a plaintiff must have suffered an injury in fact and lost money or property as a result of such unfair competition." *Ruiz v. Gap, Inc.*, 540 F. Supp. 2d 1121, 1127 (N.D. Cal. 2008) (citing *Hall v. Time Inc.*, 158 Cal. App. 4th 847 (Cal. Ct. App. 2008)) (internal citations omitted). Economic injury can occur in many ways, including "a present or future property interest diminished." *In re Sony Gaming Networks and Customer Data Sec. Breach Lit.*, 903 F. Supp. 2d 942, 966 (S.D. Cal. 2012).

AECOM can easily demonstrate it has suffered an injury in fact, and lost money or property sufficient to establish standing. AECOM has lost control over the goodwill that remains in the Morrison Knudsen name and the MK Marks, the literal loss of control over subsidiaries that it had dissolved and intended to stay dissolved,

17

and the literal loss of its trademark registration and of control over correspondence for that registration.  *See* Background, Section B, *supra*.

AECOM can also show that Defendants violated both the unlawful and fraudulent prongs of the UCL.  Defendants made multiple false statements to the USPTO in violation of 18 U.S.C. § 1001 and to the Nevada Secretary of State in violation of Nevada Revised Statute 199.145.  *See* Background, Section B, *supra*. Defendants have also made countless statements on the Fraudulent Website and in the media, designed to make actual and potential customers and business partners believe they can provide MK's expertise and background in exchange for financial gain.  *See* Background, Section C, *supra*.  And it goes almost without saying that it is egregiously unfair for a defendant to steal the identity of another company in the same industry, change the company's trademark registrations, forge a trademark assignment and take the other actions Defendants here have taken.  *See* Background, Sections B– C, *supra*.

### 3.     AECOM Is Likely to Succeed on Its Cyberpiracy Claims.

AECOM is also likely to prevail on its claim that Defendants committed cyberpiracy.  The Anti-Cybersquatting Consumer Protection Act holds a defendant liable for cyberpiracy when the defendant registers, traffics in, or uses a domain name that is identical or confusingly similar to a distinctive mark, and does so with bad faith intent to profit from the mark.  15 U.S.C. § 1125(d).

It is undisputed that Defendants registered and used the domain name www.morrison-knudsen.com when the Morrison Knudsen name and the MK Marks were distinctive.  The domain lookup tool Whois shows that this domain was created on March 25, 2008.  Torres Decl. ¶ 9, Ex. 7.  As of March 25, 2008, AECOM, when known as Morrison Knudsen Corporation and later Washington Group International, held valid trademark registrations for the word mark MORRISON KNUDSEN (Reg. No. 1716505) and the word and design mark MKCO MORRISON KNUDSEN (Reg. No. 1744815).  Walklet Decl. ¶ 5.  A registered trademark is presumed distinctive.

18

*Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1114–15 (9th Cir. 2010) ("Where the PTO issues a registration without requiring proof of secondary meaning, the presumption is that the mark is inherently distinctive."). The domain name www.Morrison-Knudsen.com is identical to Reg. No. 1716505 (MORRISON KNUDSEN) and confusingly similar to Reg. No. 1744815 (MKCO MORRISON KNUDSEN). *See Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999) ("Web users often assume, as a rule of thumb, that the domain name of a particular company will be the company name followed by '.com.'").

Finally, Defendants acted with bad faith intent to profit from the use of the domain name. Defendants knew they had no right to represent that they were MK, either to the Nevada Secretary of State or the USPTO. Defendants' motive, throughout their charade, has been to appear to be MK so that they could profit from the sale of expensive construction equipment, by fraudulently trading MK's expertise for equity stakes in other companies' projects and, if their press releases are accurate, by winning engineering and construction projects using MK's extensive history. Their registration of the domain name www.Morrison-Knudsen.com helped them convey that they were, in fact, MK. Because Defendants registered the domain name using MK's name and did so with the bad faith intent to profit, AECOM is likely to prevail on its cyberpiracy claim.

## C.   **Defendants' Actions Have Caused, and Will Continue to Cause, Irreparable Harm to AECOM.**

A plaintiff that establishes a likelihood of success on the merits must also show that irreparable injury is likely absent an injunction. *Winter*, 129 S. Ct. at 375–76; *see also Alliance for the Wild Rockies*, 632 F.3d at 1131 (noting the preliminary injunction test factors are balanced). Irreparable harm can be shown by "damage to goodwill and business reputation." *China Century Television v. Create New Tech. (HK) Ltd.*, No. cv 15-01869, 2015 WL 3649187, at \*12–\*13 (C.D. Cal. June 11, 2015)

(finding irreparable harm at least in part because the false advertising "impair[ed] plaintiffs' brand, reputation, and goodwill by associating their programming with poor quality transmissions . . ."). As the Ninth Circuit recently held in affirming a preliminary injunction, "[e]vidence of loss of control over business reputation and damage to goodwill c[an] constitute irreparable harm" and thus "evidence showing that [the defendant] used the [plaintiffs'] trademarks after the termination of the Agreement to release an unapproved line of [] products" was "enough to support a finding, at this early stage, that the [plaintiffs] likely will lose some measure of control over their business reputation in the absence of injunctive relief," and thus sufficient to establish the likelihood of irreparable harm. *2Die4Kourt v. Hillair Capital Mgmt., LLC*, No. 16-56217, 2017 WL 2304376, at *2 (9th Cir. May 26, 2017) (internal citations omitted) (quoting *Herb Reed Enters., v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1247, 1250 (9th Cir. 2013)).[2]  As one court succinctly held when finding strong likelihood of irreparable injury, "[p]otential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009) *aff'd*, 348 Fed. App'x 288 (9th Cir. 2009) (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)).[3]  Courts also consider a first-rate reputation resulting from substantial investments in advertising, promotion, and product development when deciding grounds for irreparable injury. *Groupe SEB USA v. Euro-Pro Operating LLC*, 774 F.3d 192, 205 (3d Cir. 2014) (affirming preliminary

---

[2]  *See also Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("Intangible injuries, such as damage to . . . goodwill, qualify as irreparable harm.").

[3]  *See also Stuhlbarg Int'l Sales Co. Inc.*, 240 F.3d at 841 (threatened loss of prospective customers and goodwill can constitute irreparable harm); *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1185 (E.D. Cal. 2016) (granting preliminary injunction in part due to irreparable harm because defendant's use of plaintiff's trademark "will cause Plaintiff to lose its ability to control its brand reputation and goodwill, since what could be perceived by consumers as the quality of Plaintiff's product risks no longer being within Plaintiff's control").

injunction where defendant's literally false comparative advertising was likely to injure plaintiff's reputation in the marketplace).

This is not a garden-variety false advertising case where one party makes statements with which the plaintiff takes issue. It is also not a routine passing off case where the plaintiff contends that the use of a confusingly similar name or mark is inherently likely to cause irreparable harm. And it is not the typical cyberpiracy situation involving a party that registers a domain name using someone else's mark hoping for a payoff from the mark owner. In this case, Defendants are harming AECOM by literally stealing and assuming control of its corporate entities and by stealing AECOM's trademarks—including by reregistering AECOM's marks as Defendants' own. Defendants have accomplished this theft by forgery and making repeated false sworn statements to government officials—who relied on their statements to transfer AECOM's corporate entities and trademark registration from AECOM to Defendants. *See* Background, Section B, *supra*. Thus, in a very real and immediate sense, Defendants have deprived and continue to deprive AECOM of its property interest.

Moreover, Defendants are robbing AECOM of the valuable goodwill that it **paid** to acquire. AECOM strategically chooses to invest considerable resources into acquiring companies whose brands align with that of AECOM. Szurgot Decl. ¶ 5; Kassal Decl. ¶ 3. Acquisitions of such companies enable AECOM to grow its market share and reputation, and contribute to its continued success. Szurgot Decl. ¶ 5. The continuing value of an acquired or "heritage" company stems in part from the parent company's ability to capitalize on its reputation, accomplishments and experience to achieve a competitive advantage in the marketplace. *Id.* ¶ 5; Parry Decl. ¶ 4. This competitive advantage can only be achieved if AECOM exclusively controls all decisions related to the heritage company's brand equity. Kassal Decl. ¶ 3. This type of competitive advantage is harmed significantly when a world class brand, known for a longstanding tradition of signature heritage projects, is sullied by Defendants' use of

21

the brand to sell used equipment on a website.  Kassal Decl. ¶ 7.

Indeed, within the construction and engineering industry, many jobs are won based on the quality of a company's completed projects and the goodwill reflected in the company's brand.  Szurgot Decl. ¶¶ 5, 12.  The unique accomplishments of a company are what set it apart from its marketplace competitors.  Kassal Decl. ¶¶ 4–5.  This is why AECOM lists MK and other heritage companies in promotional materials to earn new work.  Szurgot Decl. ¶ 12; Kassal Decl. ¶ 5.  By stealing MK's reputation and experience to offer their own products and services (including expensive and potentially dangerous equipment for sale to the public), Defendants deprive AECOM of the benefit of being able to claim sole credit for its accomplishments, and inflict an unquantifiable and irreparable injury.  Szurgot Decl. ¶ 12; Kassal Decl. ¶ 5.  Indeed, the very intricate efforts that Defendants have taken to gain control of the MK identity underscore just how valuable that identity is.

Defendants also now appear to be competing on a global scale.  Defendants recently issued a press release—in which they tout MK's accomplishments as their own—claiming they have been awarded a $1.2 billion contract in Indonesia.  Torres Decl. ¶ 6.  If Defendants' press release is true, Defendants are using MK's accomplishments, which AECOM alone has the right to claim, to compete directly with AECOM worldwide.  Even if Defendants' press release is false, it nonetheless diminishes AECOM's competitive advantage by depriving AECOM of the exclusive right to claim MK's accomplishments and by associating a world class brand with the likes of Defendants.  *Id.*; Kassal Decl. ¶¶ 6–7.

In short, AECOM's literal loss of control over the MK identity, its goodwill, its related corporate entities, and its trademark registration is, by definition, an irreparable harm that AECOM has suffered, and will continue to suffer, absent an injunction.

**D.**     **The Balance of Hardships Favors Granting a Preliminary Injunction.**

In contrast to the irreparable harm AECOM will suffer if Defendants are not

22

1   enjoined from continuing their sham, Defendants will not suffer any legitimate

2   hardship from the issuance of a preliminary injunction.  "Indeed, there is no harm to a

3   defendant from an injunction which prevents continuing dissemination of false

4   statements."  *POM Wonderful LLC v. Purely Juice, Inc.*, No. CV-07-02633, 2008 WL

5   4222045, at *16 (C.D. Cal. July 17, 2008) *aff'd*, 362 Fed. App'x 577 (9th Cir. 2009).

6   Requiring a defendant to refrain from using false statements in the marketplace poses

7   little danger of prejudice; "[s]uch requested relief poses little, if any, harm to the

8   defendant."  *Id.* (internal citations omitted) (quoting *Sun Microsystems, Inc. v.*

9   *Microsoft Corp.*, 87 F. Supp. 2d 992, 998 (N.D. Cal. 2000)); *see also Beckman*

10  *Coulter, Inc. v. Beckcoult.com*, No. C 10-03110, 2010 WL 2985560, at *3–*5 (N.D.

11  Cal. July 26, 2010) (granting a TRO against an imposter website under the same

12  standard "as that for issuing a preliminary injunction," where balance of hardships

13  tipped sharply in plaintiff's favor because "Plaintiff ha[d] not authorized Defendants

14  to act on its behalf or to assume its identity for any purpose").[4]

15      Defendants are imposters who made a conscious decision to steal the identity of

16  an iconic American company to which they have no rights.  They knowingly made

17  false statements to the USPTO and the Nevada Secretary of State, numerous times, in

18  order to accomplish their theft.  And they are making false statements to the public

19  and the engineering and construction industry in pursuit of profit.  They cannot now

20  legitimately complain about the hardship of abandoning their sham and being

21  precluded from no longer being able to deceive the government, actual and potential

22  customers and business partners, and the public.  The balance of hardships therefore

23  weighs decidedly in favor of granting a preliminary injunction.

24

---

25  [4] The intentional nature of Defendants' conduct also weighs heavily against them when

26  considering the balance of hardships.  *See Cadence Design Sys. Inc. v. Avant! Corp.*, 125
    F.3d 824, 829 (9th Cir. 1997) (internal citation marks omitted) ("[A] defendant who

27  knowingly infringes another's copyright cannot complain of the harm that will befall it when
    properly forced to desist from its infringing activities."); *Diller v. Barry Driller, Inc.*, No. CV

28  12-7200, 2012 WL 4044732, at *10 (C.D. Cal. Sept. 10, 2012) ("It is no hardship to cease
    intentionally infringing someone else's trademark rights.").

**E.     An Injunction Is in the Public Interest.**

It is in the public interest for Defendants to be enjoined from further perpetrating their sham. "[T]he most basic public interest at stake in all Lanham Act cases [is] the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy." *Warner Bros. Entm't vs. Glob. Asylum, Inc.*, No. CV 12-9547, 2012 WL 6951315, at *23 (C.D. Cal. Dec. 10, 2012) *aff'd sub nom. Warner Bros. Entm't v. Glob. Asylum, Inc.*, 544 Fed. App'x 683 (9th Cir. 2013). "An injunction that prevents consumer confusion in trademark cases . . . serves the public interest." *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co. Ltd.*, 534 Fed. App'x 633 (9th Cir. 2013) (affirming preliminary injunction). Consumers make assumptions about the quality of goods and services, standards, warranty, and customer service based on the seller of a product. *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 163–64 (1995); *Brookfield Commc'ns, Inc.*, 174 F.3d at 1063–64; *see also Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 122 (9th Cir. 1968) ("[O]nce the name or trade-mark of a product is firmly associated in the mind of the buying public with some desired characteristic-quality, social status, etc.-the public will buy that product."). The public has a protectable interest in being honestly informed as to the seller of a product and the quality of goods. *AT&T Corp. v. Vision One Sec. Sys.*, No. 95-0565, 1995 WL 476251, at *7 (S.D. Cal. July 27, 1995) ("Here, the public should not be deceived by [defendant's] holding itself out as an authorized AT&T dealer."); *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 2014 WL 2002126, at *13 (W.D. Penn. May 15, 2014), *aff'd* 774 F.3d 192 (3d Cir. 2014) (granting preliminary injunction against literally false claims to "ensure that the consuming public is able to make an informed decision based on accurate information").

An injunction here would benefit the public because it would prohibit Defendants from deceiving members of the engineering and construction industry. Defendants offer for sale construction equipment, with the necessary implication that it has been used and maintained by MK. Defendants also effectively offer for sale

24

MK's expertise in soliciting equity stakes in third party projects.  When potential customers consider purchasing a $200,000 piece of construction equipment from Defendants or potential business partners consider giving an equity stake in a project in return for advice, they are considering the MK brand and reputation in that decision.  Because Defendants are not MK and do not have the expertise of MK, they are causing potential customers and business partners to make decisions based on false information about the quality and safety of large pieces of construction equipment or about the expertise of imposters seeking to advise on construction projects.  Enjoining Defendants from making such false representations would promote public safety.

An injunction would also serve the public interest because it would prohibit Defendants from making further false statements to government agencies, such as those Defendants made repeatedly to the Nevada Secretary of State and the USPTO. It is in the public interest for government records available to the public to be accurate and for perjurers to be stopped.  *See U-Haul Int'l, Inc. v. Jartran, Inc.*, 681 F.2d 1159, 1162 (9th Cir. 1982) ("[T]he Lanham Act is directed toward protecting the consumer as well as the competitor from false and deceptive advertising.").

## CONCLUSION

For the foregoing reasons, AECOM respectfully requests that the Court immediately cease Defendants' fraudulent behavior and grant its motion for a preliminary injunction.

DATED:  July 28, 2017                     Respectfully submitted,


                                          /s/ Diana M. Torres
                                          Diana M. Torres
                                          *Attorney for Plaintiff*
                                          AECOM ENERGY &
                                          CONSTRUCTION, INC.